409 F.2d 922
 70 L.R.R.M. (BNA) 2662
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
INTERNATIONAL BROTHERHOOD OF BOILERMAKERS, IRON
SHIPBUILDERS, BLACKSMITHS, FORGERS AND HELPERS,
LOCAL LODGE NO. 338, AFL-CIO, Respondent.
 No. 10136.
 United States Court of Appeals Tenth Circuit.
 Feb. 20, 1969, Rehearing Denied April 4, 1969.
 
 Robert E. Williams, Washington, D.C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Elliott Moore, Washington, D.C., were with him on the brief) for petitioner.
 John J. Blake, Kansas City, Kan., for respondent.
 Before JONES,* LEWIS and HOLLOWAY, Circuit Judges.
 DAVID T. LEWIS, Circuit Judge.
 
 
 1
 The National Labor Relations Board seeks enforcement of its order issued against the respondent Union and based upon a Board determination that the Union had violated sections 8(b)(1)(A) and 8(b)(2) of the National Labor Relations Act by causing the employer[1] of Cecil Church to discriminate against him in his right to continued employment. The order requires customary remedial provisions including the duty to make Church whole for any loss of pay resulting from the Union's conduct. The Board's decision and order are reprted at 166 N.L.R.B. No. 93.
 
 
 2
 The charging party, Church, who in 1945 joined the Union as a charter member, had worked for the Company intermittently from 1944 through 1962. He then left the Company's employ and obtained a withdrawal card from the Union. Church returned to work with the Company on September 19, 1966, at which time the Union-Company contract contained a union security clause requiring among other things[2] that employees become members of the Union on the thirty-first day following the date of their employment.
 
 
 3
 On the day that he was hired, Church was contacted by the Union's business representative, Frank Mora, who requested deposit with him of Church's withdrawal card. Such request was apparently made by Mora with the subjective intent of effectuating the provisions of Article XXXII, section 2 of the Union constitution:
 
 
 4
 'A member who holds a Withdrawal Card, on returning to work at the trade, whether such member is employed in either an organized or unorganized shop, shall deposit such Withdrawal Card with the Business Manager or Secretary-Treasurer of the Local Lodge having jurisdiction over the territory or the work. Failure on the part of a former member to deposit the Withdrawal Card shall cause it to be immediately cancelled or revoked. Any former member who has held a Withdrawal Card for six (6) months or less, shall pay to the Local Lodge in which the Withdrawal Card is deposited all dues and assessments which have accrued since the issuance of the Withdrawal Card, plus one (1) month's death benefit contribution if a participating member, and assessments, if any, for the month in which the Withdrawal Card is deposited.
 
 
 5
 * * * or if Withdrawal Card has been held for more than six (6) months, the application shall be accompanied by one (1) month's dues and one (1) month's death benefit contribution.'
 
 
 6
 Church did not then have his withdrawal card in his possession but promised that he would obtain it as soon as possible. On October 3, Mora again asked for the card. Church explained that he had written for it and would get it as soon as he could. Mora replied, 'Well that is fine, but I guess you know that you beat me out of September's dues.' Later in the day Church received his withdrawal card in the mail but Mora had left town and the two did not see each other again until October 17.
 
 
 7
 On October 17, Church gave his withdrawal card to Mora who then stated that according to the Union constitution Church was required to pay October and September dues. Church acknowledged that he owed for October and denied any obligation for September dues. Mora then called the Company shop supervisor, Helman, told him that he (Mora) was having trouble with Church, and requested Helman to urge Church to pay the September dues. Helman contacted Church, asked him if he had paid his dues, and was informed that he had not. On October 19 Helman again asked Church if he had straightened out with the Union and received a negative reply.
 
 
 8
 Meanwhile Church had several times tendered his October dues including an actual mailing of his check to the Union by registered mail. On October 20 (the thirty-first day of Church's employment) Mora telephoned Helman and, according to his own testimony, told Helman that Church had not paid his September dues, was not in good standing, and then 'asked Charlie Helman to tell Cecil (Church) to come and straighten it out with the Union before he could go back to work.' During the late afternoon of October 20, Helman did tell Church that he would have to get straightened out with the Union before he could go back to work. Church left the job site immediately and did not return to work the next day.
 
 
 9
 By letter dated October 20, Mora returned to Church his check for October dues and informed him that the withdrawal card had been sent to the International for cancellation and that membership in the Union could only now be obtained through the process of application for reinstatement.[3]
 
 
 10
 From this factual background the Board found that the Union had caused the termination of Church's employment because of his failure and refusal to pay dues for September, a violation of section 8(a)(3) of the Act and thus a violation of section 8(b)(1)(A) and (2) of the Act. Such finding is clearly supported by the evidence for the record indicates a continuous and limited controversy between the Union and Church as to the latter's requirement to pay September dues as a condition of continued employment with the Company. The Union insistence upon the payment of September dues was in direct contravention of the collective bargaining agreement's union security clause and constituted a demand upon Church for dues that he had no statutory duty to pay. The Union conduct constituted an unfair labor practice, NLRB v. Campbell Soup Co., 9 Cir., 378 F.2d 259, cert. denied 389 U.S. 900, 88 S.Ct. 220, 19 L.Ed.2d 217, and consequently the Board order will be enforced.
 
 
 11
 In directing enforcement we do, however, give no judicial comfort to the Board decision to the extent that its decision may be argumentatively interpreted as holding that the Union's constitutional provision, cited supra, is, per se, in legal conflict with the contractual union security provision of the subject contract.[4] The Union could properly prescribe reasonable internal rules for obtaining, retaining or regaining intraunion good standing for membership under section 8(b)(1)(A) of the Act and voluntary compliance with such rules by a member, even though payment of dues for the grace period of a union security contract is included, is not violative of the Act when such rules have no element of sham or purpose to destroy the policy of the Act in insulating the right to employment from organizational rights. But such an internal rule can be no more than a permissive path for an employee to secure his right to continued employment under a union security clause and the rule cannot be enforced in contravention of that right. In the case at bar the controversy between Church and the Union rose no higher and presented no alternative than a demand for September dues and a failure or refusal to pay them as a condition of continued employment. So considered the Unions's conduct was prohibited under the Act. NLRB v. Spector Freight System, Inc., 8 Cir., 273 F.2d 272, cert. denied 362 U.S. 962, 80 S.Ct. 879, 4 L.Ed.2d 877.
 
 
 
 *
 Senior Judge of the United States Court of Claims sitting by designation
 
 
 [1]
 Eidel International Division Southwest Factories, Inc., a New Mexico corporation (Company)
 
 
 [2]
 The union security provision provides:
 'All present employees covered by this Agreement and coming under the jurisdiction of the Union, as set forth in the Recognition Clause, Article 1, shall, as a condition of employment, become members of the Union on the thirty-first (31st) day following the effective date of the Agreement and shall remain members in good standing during the life of this Agreement. All employees hired after the effective date of the Agreement shall, as a condition of employment, become members of the Union on the thirty-first (31st) day following the date of their employment, and shall remain members of the Union in good standing during the life of this Agreement.'
 
 
 [3]
 This process required a $60 reinstatement fee in addition to payment of all financial delinquencies
 
 
 [4]
 The dissenting Board member has apparently so interpreted the decision